Ora P. HALL, Plaintiff-Appellant,

v.

Anthony J. CELEBREZZE, Secretary of
Health, Education, and Welfare,
Defendant-Appellee.

No. 14999.

United States Court of Appeals
Sixth Circuit.

March 11, 1963.

Ora F. Duval, Olive Hill, Ky., for appellant.

Alan S. Rosenthal, Dept. of Justice, Washington, D. C., (Joseph D. Guilfoyle, Acting Asst. Atty. Gen., Alan S. Rosenthal, John Edward Porter, Attys., Dept. of Justice, Washington, D. C., Bernard T. Moynahan, Jr., U. S. Atty., Lexington, Ky., on the brief), for appellee.

Before MILLER and WEICK, Circuit Judges, and THORNTON, District Judge.

WEICK, Circuit Judge.

This case is here a second time on an appeal from the denial of disability benefits under the Social Security Act. We reversed the judgment in the first appeal and remanded to the Secretary of Health,

Education and Welfare in order that further evidence be taken and findings made on the issues of what appellant can do and what employment opportunities are available for a person in his condition. Hall v. Flemming, 6 Cir., 289 F. 2d 290.

No oral testimony was taken on the remand. Instead, the Appeals Council received in evidence a statement of the claimant, additional medical reports, clinical summaries of his hospitalization, and letters from his employer and lay persons. The Appeals Council also procured a booklet issued by the Department of Labor entitled "Estimates of Worker Trait Requirements for 4000 Jobs as defined in the Dictionary of Occupational Titles." The appellee's appendix contained the evidence and exhibits offered at the original hearing.

In a single spaced typewritten opinion consisting of twenty-two pages, the Appeals Council considered all of the evidence and ruled that appellant could engage in some form of substantial gainful activity and employment opportunities were available for a person in his condition and again denied his claim for benefits. The District Court affirmed.

 On consideration of the record as a whole, we are of the opinion, for the reasons hereinafter stated, that these findings are not supported by substantial evidence and cannot stand. Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456; National Labor Relations Board v. Walton Mfg. Co., 369 U.S. 404, 405, 82 S.Ct. 853, 7 L.Ed.2d 829.

At the time of his disability in 1956, Mr. Hall was 53 years old. He had an education in which he reached the eighth grade. He had been employed by the Lee Clay Products Company of Clearfield, Kentucky for nearly thirty years making patterns for sewer pipe fittings and also molds out of plaster. He also did some carpenter work. Prior to this employment he had performed labor in a lumber yard and on a railroad. His employer described him as "one of our most valued employees" and as a "good hard worker."

He had a history of kidney trouble, but in later years this condition grew worse. He had a severe kidney attack in 1953 and another one in 1954 when he was unable to work for about a month.

His condition was diagnosed by his physician, Dr. Douglas E. Scott, who was a urologist, as hydronephrosis [1] of both kidneys and arthritis in the upper lumbar spine. In April 1955 he had an operation on the right kidney and the following September another operation on the left kidney. These operations were described as right and left pelvioplasty and the purpose was to arrest the hydronephrosis. In December 1955 Hall was in the hospital again for the removal of a right kidney stone. Dr. Scott, who performed all three operations, reported to the Secretary on June 20, 1957 that although the progress of the condition appears to have been arrested, the "X-rays showed very extensive left hydronephrosis with impaired renal function. Moderate right hydronephrosis with fairly good renal function." Dr. Scott stated that "I believe patient unable to do the work for which he is qualified." Mr. Hall was in the hospital fifty-eight days. He visited Dr. Scott at his office twenty-one times up to the date of the report.

Following the operations, Mr. Hall returned to work and his employer gave him lighter work, but he was unable to perform it. He suffered hematuria and quit working on December 14, 1956 and has not worked since that time. Dr. Scott made another report to the Secretary on January 26, 1958. Under subjective symptoms he stated "Pain in both kidney areas on exertion. Hematuria (gross) noted on exertion." Under objective symptoms he noted that the left kidney was severely damaged. The right kidney was slightly damaged. He stated further: "With effort that is more than short walks patient gets back pain and

1. A collection of urine in the pelvis (sac) of the kidney, forming a cyst by the production of distention and atrophy of the organ.

has had gross hematuria with attempts at more strenuous effort." Under the topic of remarks Dr. Scott stated: "Because of this man's kidney situation and in addition his arthritic symptoms (shoulders, cervical, dorsal & upper lumbar spine) I consider him incapable of physical work. He has no training for any sedentary occupation." He stated that "I have advised that he undertake no physical work." In his report dated April 19, 1958, Dr. Scott stated that "hydronephrotic kidneys of this degree are subject to injury under conditions of manual labor" and that he had advised Mr. Hall not to undertake such work. He further said that it was not "unreasonable to consider him totally incapacitated."

Hall's attending physician, Dr. E. W. Blair, in a report dated June 18, 1957, diagnosed his condition as pyelonephritis (inflammation of the kidney and its pelvis) and nephrolithiasis (a condition marked by the presence of renal calculi). Dr. Blair also advised Hall not to work. In his report dated May 10, 1958, Dr. Blair stated: "I am positive that Mr. Hall is 100% disabled for work of any kind and I heartily recommend that he be given social security." On May 5, 1959, Dr. Blair was of the same opinion.

We read the medical reports of Doctors Blair and Scott to mean that Hall was unable to perform any physical work or manual labor.

Appellee argues that since Dr. Scott, in his reports made no mention of pyelonephritis, the Secretary was free to follow the opinion of Dr. Scott rather than that of Dr. Blair, who was a general practitioner. We doubt that Dr. Scott's diagnosis of a "severely damaged" left kidney would necessarily exclude the condition of inflammation found by Dr. Blair.

In the clinical summary of Good Samaritan Hospital (Exhibit 8), which the Secretary offered in evidence, Dr. Scott gave a diagnosis of right acute pyelonephritis.

Dr. Hoffman, a urologist, who examined Mr. Hall at the request of the Secretary on November 15, 1961, stated: "The appearance of the left kidney is consistent with chronic pyelonephritis and previous renal surgery. Impression: Moderately severe hydronephrosis left kidney with evidence of previous renal surgery and chronic pyelonephritis. The right kidney has moderately good function with slight dilatation of the renal pelvis consistent with previous renal surgery." The fact that Dr. Hoffman in 1961 found the same condition to exist with respect to the left kidney as did Dr. Blair in 1957 certainly does not disprove Dr. Blair's diagnosis, but rather would seem to confirm it. Once a condition has been shown to exist, there is a presumption, in the absence of proof to the contrary, that it has continued. Dr. Scott reported under date of October 4, 1961 that subsequent X-rays showed no change from his previous reports and that "Occasional urine specimens show small amounts of pus and some bacteria."

The Secretary had Mr. Hall examined by Dr. Carter, an orthopedic surgeon. Dr. Carter reported minimal osteoarthritis and that disability was limited to that which was caused by the kidney condition.

Neither Dr. Carter nor Dr. Hoffman expressed any opinion on the issue whether Mr. Hall could perform physical work or manual labor. The medical testimony of Doctors Scott and Blair with respect to the degree of disability was, therefore, uncontradicted.

Since Mr. Hall ceased work in 1956 he has washed dishes at home and fried eggs. Sometimes he waits on his wife who is ill, and other times she waits on him. Their neighbors help with the housework and washing. They have no income except what is donated by friends and relatives. Mr. Hall has gone for short walks, but when he does "it starts weightin' in here and it starts hurtin' in there and then over these kidneys, it begins to pull and get tired when I start walking." He cannot sit down very long.

He suffers pain at intervals, particularly when he walks too much. He rests on a couch at his home "most of the time."

The Appeals Council determined from said Worker Trait Requirements booklet that Mr. Hall's job was heavy work. We think the evidence establishes that fact. The Council also determined from the booklet that Hall was a skilled worker. There was no other evidence to support this determination. His employer apparently did not so regard him. Hall's record of earnings over a twenty year period from 1937 through 1956 indicated annual wages as low as $1,399.64 and not higher than $3,368.46. His average over all this time did not exceed $200 a month. In the year 1955, when the three operations were performed, he earned only $710.07. In 1956 he earned $2,358.-82. He has earned nothing since.

The Council concluded:

"With his skills and experience, it would not have been difficult for the claimant to engage in work requiring similar or related skills, but making few physical demands upon him. There are numerous examples of sedentary and semi-sedentary job classifications to which he could have transferred his skill in drawing, reading blueprints, shaping clay, making plaster molds, using handtools for cutting, fitting, shaping and assembling small parts made from wood or related material, and inspecting and testing patterns for accuracy. U. S. Dept. of Labor, 'Dictionary of Occupational Titles,' Vol. 1 (2d ed. 1949) and Part IV (rev. 1944); id., 'Estimate of Work Traits,' supra. Such examples include the following: caster, pottery and porcelain industry; finisher, pottery and porcelain industry; paster, brick and tile industry; millman, brick and tile industry; plaster-of-paris molder (making patterns for electrical equipment); smoking pipe maker; stock maker for guns; toy maker, wood; and wood letter carver. Many others require fewer skills."

There was no evidence that Mr. Hall had skill in drawing or reading blue prints. In making drawings, Hall had copied them from a book. The other examples of job classifications referred to required physical effort or manual labor which the uncontradicted evidence shows he was unable to perform and was advised against doing so by his doctors.

The Appeals Council mentioned that Hall attended the hearing before the Referee and walked up the steps leading to the hearing room. This indicated that he was ambulatory, but not that he could engage in any substantial gainful activity. The Referee noted that during the progress of the hearing Hall asked for permission to stand up and during a subsequent recess was seen holding his hand over his left hip.

As to job opportunities, the Secretary referred Mr. Hall to the Kentucky Bureau of Rehabilitation Service as he was required to do under Section 222 of the Act. The Service refused to accept Mr. Hall for rehabilitation on two grounds, namely, "a. impairment too severe" and "b. no employment opportunities." The Appeals Council ruled that the standards of these agencies vary from state to state and that the rejection by the Kentucky agency, therefore, shed no light on the narrow issue of his ability to engage in "any substantial gainful activity."

The rejection for rehabilitation by the Service, at least, was some evidence that nothing was available in the way of employment opportunities for Hall in Kentucky. We cannot believe that the Secretary is suggesting that if employment opportunities for a disabled person are not available in the state where he has lived for practically all of his life that he should pull up stakes and move to some far off place where such opportunities might be better. Butler v. Flemming, 288 F.2d 591, 595 (C.A.5).

The Secretary gave no weight to the uncontradicted opinion evidence of Doctors Scott and Blair heretofore set forth with respect to Hall's disability. Since the statute required that the disability result from a "medically determinable

**690**

physical or mental impairment." (42 U.S.C. § 416(i) (1) and § 423(c) (2) ), the claimant had no way of establishing his case if his credible medical evidence is disregarded. While the Secretary may have expertise in respect of some matters, we do not believe he supplants the medical expert.

 In our opinion, it was competent for medical experts to testify as to the nature and extent of Hall's ailments, whether temporary or permanent, their treatment and prognosis. They could testify as to what effect these ailments had on his health and his ability to perform manual labor including the degree of his disability.

Wigmore states:

"Opinions as to physical disability to pursue an occupation, under the Federal statutes for War-veterans and under accident insurance policies, here involve the additional risk of being an improper opinion as to the legal effect of the statutory or contractual phrase. But since those phrases are also common in general popular usage, the Opinion rule ought not to stand in the way of opinions offered by persons having the requisite knowledge of the party's physical condition." Wigmore on Evidence, 3rd ed. § 1975, p. 120.

In Tackett v. Eastern Coal Corp., 295 Ky. 422, 174 S.W.2d 707 the court said:

"The percentage of disability cannot be fixed with mathematical accuracy, but opinions of medical experts based on examinations made by them are competent."

In United States v. Calvey, 110 F.2d 327 (C.A.3) a physician was permitted to testify that the patient was disabled "from doing any kind of work." In United States v. Cannon, 116 F.2d 567 (C.A.1), it was held proper for a doctor to testify that disability was total and permanent. See also: Rowe v. Gatke Corp., 126 F.2d 61 (C.A.7) ; Corrigan v. United States, 82 F.2d 106 (C.A.9).

It was not necessary that Hall be bedridden or wholly helpless in order to establish his claim for benefits. Berry v. United States, 312 U.S. 450, 455, 61 S.Ct. 637, 85 L.Ed. 945; Cf. Everhart v. State Life Ins. Co., 154 F.2d 347 (C.A.6) ; Mutual Life Ins. Co. v. Bryant, 296 Ky. 815, 177 S.W.2d 588, 153 A.L.R. 422 and Gibbons v. Metropolitan Life Ins. Co., 135 Ohio St. 481, 21 N.E.2d 588.

 In our opinion, on the basis of the uncontradicted evidence, Hall is entitled to disability benefits under the Act. Butler v. Flemming, 288 F.2d 59 (C.A.5) ; Underwood v. Ribicoff, 298 F.2d 850 (C.A.4) ; Roberson v. Ribicoff, 299 F.2d 761 (C.A.6) ; Erickson v. Ribicoff, 305 F.2d 638 (C.A.6) ; Jarvis v. Flemming, 312 F.2d 707 (C.A.6).

The judgment of the District Court is reversed and the cause is remanded with instructions to allow disability benefits to the appellant.