**Erwin RICE, Plaintiff-Appellant,**

v.

**Anthony J. CELEBREZZE, Secretary of Health, Education and Welfare, Defendant-Appellee.**

**No. 14893.**

United States Court of Appeals
Sixth Circuit.
March 22, 1963.

Charles S. Sinnette, Ashland, Ky., for appellant.

Alan S. Rosenthal, Dept. of Justice, Washington, D. C. (William H. Orrick, Jr., Asst. Atty. Gen., Stanley M. Kolber, Atty., Dept. of Justice, Washington, D. C., Bernard T. Moynahan, U. S. Atty., Lexington, Ky., on the brief), for appellee.

Before McALLISTER, Senior Circuit Judge, and BOYD and TAYLOR, District Judges.

McALLISTER, Senior Circuit Judge.

Appellant seeks review of the order of the district court, sustaining the final decision of the Secretary of Health, Education and Welfare, and holding that the findings of the Administrator that appellant was not entitled to disability benefits under the Social Security Act, Title 42 U.S.C.A. § 401 et seq., are supported by substantial evidence.

Appellant contends that his own testimony and the evidence of three physicians show that he is entitled to disability benefits. The evidence opposed to the foregoing contention is found in the report of Dr. W. C. Roland, who stated that he could not "conscientiously arrive at any diagnosis which would indicate the presence of permanent partial disability." It appears, however, that, regardless of Dr. Roland's report, the appellee concluded, in the language of the Hearing Examiner, that the evidence showed the claimant was subject to limitation of motion and physical distress and that as a result, he was unable to resume his previous occupation as a stationary engineer or engage in any other similar employment. Nevertheless, appellee found that appellant's impairments were not of sufficient severity to preclude him from engaging in substantial gainful activity.

The issue then is whether, considering the evidence of appellant's disability, there is substantial evidence to sustain appellee's findings that such disability was not of sufficient severity to keep him from engaging in substantial gainful activity, and that he was not, therefore, entitled to disability benefits.

The evidence disclosed that on July 7, 1957, appellant, while working for the Union Carbide Chemicals Company, fell on an oil-covered portion of a cement floor, but continued on the job until August 7, 1957, when, at the age of 53, he stated, he became unable to engage in any further work. He subsequently prevailed upon the company to give him a lighter job at which he started working on January 11, 1958; but he had to stop this work on February 9, 1958, because of pain in his hip.

At the time he applied for disability benefits on May 12, 1958, he was suffering from diabetes, hypertension, and arthritis. The diabetes was controlled by drugs, but appellant's diet was greatly restricted because of that disease. The hypertension was characterized as moderate. The arthritis could be treated by cortisone, but appellant cannot take cortisone, because it raises his blood pressure, and his hypertension forbids such treatment.

Appellant testified that he had been employed at the Union Carbide Chemicals Company as a stationary engineer from 1941 up to the time of the accident on July 7, 1957. Afterward, he was kept on for awhile, and given lighter work from January 11, 1958, to February 9,

1958, as mentioned above. During this past period of lighter work, he was engaged at the company in checking one engine in the diathermic department, and walked around the building checking the equipment on the outside. Appellant stated that he suffered "pain and agony." Most of the pain was in his legs and hip and back. He states he cannot even tie his shoes; he walks with a cane "because my knees want to buckle on me"; he cannot get into a bath tub; his wife has to assist him in and out of the bath tub, and in and out of bed, because of his disability; he cannot walk a block, without shortness of breath.

Appellant did not finish the third grade at school. Before being stationary engineer at the Union Carbide Chemicals Company, he was employed as a guard at the plant during the early years of the war. Before being a guard, he did repair work, and odd jobs, such as cutting grass; and he worked at plumbing, which he just "picked up" by himself. It is a mark of his popularity among the people of his home town, that while he was a guard at the plant, he was elected as an alderman of the City of Catlettsburg, Kentucky, and served in that capacity for six years; that afterward, while he was performing the duties of stationary engineer at the Union Carbide Company, he was elected Mayor and served eleven years in that capacity; but he became inactive as Mayor within a few weeks of the accident, and gave up the office a few weeks later.

Dr. Paul A. Bryan treated appellant beginning on February 7, 1957, on May 12, 1958 and through January 1960. His diagnosis was diabetes, hypertension, and traumatic arthritis of the left hip and knee. On May 12, 1958, Dr. Bryan stated that he had been treating appellant weekly since February 7, 1958; that he had advised appellant not to work; that appellant's cardiac functional capacity was Class 4, meaning that there was a complete limitation of physical activity; that appellant suffered acute respiratory attacks on moderate exertion, and cardiac impairment of dyspnea, or difficult and painful breathing, on moderate exertion. On August 15, 1958, Dr. Bryan, in his medical report filed with the Department of Health, Education and Welfare, stated that appellant was unable to walk without a cane; that he was dizzy and weak at times; that the flexion of his left knee and left hip was limited to 45% each, and this, with resistance and pain. He further reported that appellant "is entirely unable to work. He will probably never be able to do active work, and is probably totally and permanently disabled therefrom."

On July 15, 1959, Dr. Bryan filed a further certificate to the same effect; and on January 27, 1960, Dr. Bryan made an affidavit for presentation to the Social Security Administrator, that appellant was suffering from diabetes and traumatic arthritis caused, in Dr. Bryan's opinion, by a fall whereby his left hip was injured; that "affiant has treated this patient for the aforesaid arthritis from the same dates and times as the diabetes mellitus; that in affiant's opinion, this patient's arthritic condition will continue to become progressively worse unless proper treatment and care are provided; that in summary, this patient suffering from diabetes and traumatic arthritis, will be and is unable to do any work; that affiant believes that this patient is totally and permanently disabled in that as it pertains to his ability to perform or to fulfill the position of employment."

Dr. R. D. Eastridge examined appellant on August 11, 1958, at the request of Dr. Bryan. Dr. Eastridge conducted no laboratory tests, nor did he obtain X rays or an electrocardiogram. He reported that appellant had traumatic arthritis of the left hip and lumbosacral spine, and also diabetes which was regulated. He stated appellant was taking analgesics (pain relievers) for frequent but not regular arthritic pain. Dr. Eastridge found moderately elevated blood pressure, but no heart abnormality, no edema (swelling of the ankles), and no angina (sharp chest pain usually associated with heart disease) due to the

fact that he was a diabetic. It was found that there was limitation of motion and traumatic arthritis at the left hip and *in the lumbosacral spine* as well as an atrophy (shrinking) of the muscles of the left leg. Pain on movement of the hip *and lower spine* was also discovered. However, his neurological examination produced no findings except for a faulty gait, and described appellant as "ambulatory about house on cane." Dr. Eastridge found a normal vital (breathing) capacity and no deformity of the chest, nor any emphysema. He also found that walking resulted in dyspnea, or difficult and painful breathing. He concluded, in his medical report, that appellant was totally disabled.

Dr. R. O. Burns, a specialist in internal medicine, examined appellant on May 14, 1959, at the request of the Kentucky Bureau of Rehabilitation Services. It was noted that physical examination revealed moderately elevated blood pressure. Appellant was in no obvious distress except in walking. His lungs were clear and his heart disclosed a normal sinus rhythm, without murmurs or enlargement. Dr. Burns performed pulmonary function studies which were interpreted as normal with no evidence of any significant impairment. X rays disclosed a normal heart and chest, without any evidence of pulmonary disease. Dr. Burns concluded that appellant was disabled from returning to his previous employment.

We have, therefore, the testimony of appellant as to his injury and the fact that he is in almost constant pain and unable to perform any substantial gainful activity, as well as the evidence of two physicians reporting to the Social Security Administration that, in their opinion, appellant is totally disabled; and the opinion of a third physician that appellant was disabled from returning to his previous employment, after a brief and limited pulmonary examination.

To sustain the findings of the Secretary of Health, Education and Welfare denying disability benefits to appellant, counsel for appellee relies upon the reports of Dr. William C. Roland, an orthopedist. But it is here to be said, in anticipation, that the Hearing Examiner and the Appeals Council rejected Dr. Roland's report to the effect that appellant was not disabled.

Dr. Roland's first report and summary, dated May 5, 1958, showed that about a week after appellant sustained the injury to his hip on July 7, 1957, he consulted his family physician, Dr. L. H. Winans, who advised him to take hot baths and use a heating pad. He did this with moderate benefit. Dr. Roland further reported that appellant thereafter consulted Dr. R. J. Sexton, a company physician, on August 7, 1957, because he was still suffering pain in his left hip. Dr. Sexton sent him home for recovery, and advised him to see an orthopedist.

On August 9, 1957, appellant consulted Dr. Roland, complaining of pain in the region of his left hip. According to Dr. Roland's report of the consultation on that day, appellant stated "that he slipped on an oil spot in the plant while at work approximately 7/7/57. He fell heavily on his left hip and was unable to move or rise for a few moments. After this he found that he could walk with a limp and was finally able to finish the day's work. The next day he was very sore in the region of his left hip and was hardly able to walk. He told his foreman he wished to see a physician, but was 'talked out of it.' "

In the summary of his examination of appellant on August 9, 1957, Dr. Roland reported: "At the present time, Mr. Rice complains of pain over the posterior left greater trochanteric region, limp, especially following long sitting or walking. He notes numbness of 'my whole leg,' tingling down the back of 'my left leg' and black and blue discoloration over the left hip region was noted shortly after the injury, but has now disappeared.

"On examination, Mr. Rice is a middle-aged, white male in good general condition. His only positive physical findings at the present time are tenderness at the left gluteus maximus insertion, with

some consequence of discomfort on passive or active manipulation of the left hip and lower extremity.

"X-ray examination of the left hip and upper femur were within normal limits.

"CLINICAL IMPRESSION: Contusion and strain at the left gluteus maximus attachment with probable Bursitis at the distal insertion of the gluteus maximus.

"Mr. Rice was treated by the local infiltration of fifteen cubic centimeters of .15 per cent Pontocaine at the site of the maximum tenderness, followed by one cubic centimeter of Meticortelone. Subjective symptoms were relieved by this medication and Mr. Rice was asked to return in one week for reexamination and treatment as necessary."

On August 15, 1957, appellant returned to see Dr. Roland, stating the pain had returned although of less intensity and he was again treated by twenty cubic centimeters of Pontocaine and one cubic centimeter of Hydeltra. On August 20, he again returned and had received somewhat the same treatment. He had secured partial relief for three days but following that period, he had pain in his left hip in approximately its original intensity. His activity seemed to aggravate the condition, "but he finds using a cane helpful." He was again treated with injections similar to those given him previously, and on August 26, he again consulted Dr. Roland, stating that he had been completely relieved from his pain for some days but that the symptoms then recurred "less severe than his original status." The same treatment was repeated and he was asked to return in about a week.

On September 5, he reported to Dr. Roland that he felt approximately 50% improved; that he had much less pain when walking, although he was still using the cane. His sleep was better but he was not yet ready for work. On September 17, 1957, he reported to Dr. Roland that his condition was approximately the same, except for nervousness, and he was given tranquilizing medication and treated with short wave diathermy. On December 12, appellant consulted Dr. Roland again and stated that he had been reexamined by the company physician, Dr. R. J. Sexton, the day before, and was told that he was not physically able to return to work. Dr. Roland stated that appellant told him that he was improved since his last examination, and requested Dr. Roland's permission to report to his regular job January 1, 1958. Dr. Roland concluded his report with the following statement: "Since I have been treating Mr. Rice entirely symptomatically for a subjective complaint, that is, pain in the left greater trochanteric region, I see no reason to withhold this permission. Other than a moderate amount of disuse atrophy of the left lower extremity, there are no physical findings of consequence. Mr. Rice is, therefore, discharged from treatment and given permission to report for his regular job January 1, 1958. He was told to report to me if any further complication or new difficulty occurs.

"I do not feel that Mr. Rice has sustained any permanent partial disability as a result of the injury of July 7, 1957."

As mentioned above, this report, including the summary, was made by Dr. Roland on May 5, 1958. Apparently, it was prepared for the employer of appellant as well as for appellant himself, since the report, which was addressed to appellant, began with the sentence: "The following are copies of the report of examination and subsequent progress reports, sent to your employer."

With regard to the report of Dr. Roland that appellant told him on December 12, 1957, that he was improved since his previous examination, and requested Dr. Roland's permission to report to his regular job on January 1, 1958, appellant testified on the hearing that he begged Dr. Roland to give him this permission, as the company would not let him go back to work without the Doctor's release, and appellant wanted to get back and see if he couldn't serve as an employee in some way for another five years, until he was sixty, when he could receive pension or

retirement pay from the company. He testified:

"I was in pain and agony all the time I was doing that. What I was trying to do——I was trying to shoot for the age of sixty and get the retirement from the company. The company will retire you if you want to. I was trying to tough it out——to try to work until I was sixty. The company retires you at sixty with full benefits. I had begged them, along that line, to let me try this job so I could shoot for the age of sixty, and I couldn't do it."

After the foregoing report of Dr. Roland, appellant was again examined by him for the Social Security Administration, for disability, on October 10, 1958. At that time, Dr. Roland reported that appellant's findings were so dissimilar to the complaints and findings for which he had been previously treated that he was asked to return to the Doctor's office on October 23, 1958, for another examination. During his first visit on October 10, 1958, and upon his return visit on October 23, 1958, appellant, according to Dr. Roland, "stated that he had pain in the left hip, which extended up his back from the left hip, and that this back pain began in February of 1958. The involved area, as indicated by the patient, comprises the entire thoracolumbar area. Mr. Rice described the pain as extending down the left leg to all the toes of his left foot. He states that he uses a cane to prevent falling and to prevent his left knee from buckling. He has been under the care of Dr. Paul Bryan for treatment since February 1958."

Dr. Roland's report continues:

"Physical examination shows a heavy fifty-four year old white male, who stands straight with level pelvis, straight spine and balances with ease in both lower extremities. This patient states, however, he prefers to protect the left lower extremity, and either employs a cane or crutch or holds on to furniture, when not actually undergoing examination. Forward flexion of the back is exe-cuted to 30 degrees, and the patient complains of pain in his left hip on this maneuver. Backward bending and bending to the right and left is executed to normal limits for his age and size. Neurological examination of the lower extremities shows the right ankle jerk to be greater in amplitude than the left; possibly indicating some diminution of the left ankle jerk. Sensory examination shows a 'stocking' hypesthesia over the entire left leg, extending as high as the left inguinal ligament. The circumferential measurements show three-fourths inch atrophy of the left calf and one-fourth inch atrophy of the left thigh. Motion of the right hip is full; there is no flexion deformity of the left hip. Examination of the left hip shows flexion approximately 90 degrees, and other motions of the left hip, including extension, internal rotation, external rotation, abduction and adduction, are approximately 50 per cent of normal; the patient's voluntary resistance to these maneuvers prevents carrying the joint through a range which I feel the joint would allow. Straight leg raising tests are positive on the right at 80 degrees, and on the left at 20 degrees.

"X-ray examination of the left hip and knee in anteroposterior and lateral views are normal. The only abnormality seen is evidence of mild osteoarthritic changes in the knee joint, as evidenced by marginal spurring at the upper and lower poles of the patella in the lateral view.

"*Clinical Impression and Summary:* This patient is currently engaged in litigation concerning possible disability as a consequence of his injury of July 7, 1957. A summary of the details concerning this injury is enclosed. As stated at the end of my summary, I find no evidence of permanent partial disability as a result of this injury. In addition, I find very little objective evidence of

disability at the present time. It is possible that the patient has developed a disc protrusion and his symptoms and findings may be due to nerve root pressure from disc impingement. A lumbar myelogram would be necessary to investigate this more fully. Pending the performance of a myelogram, however, I cannot conscientiously arrive at any diagnosis which would indicate the presence of permanent partial disability in this patient."

Since appellee Secretary relies on Dr. Roland's report to sustain his decision that appellant Rice was not disabled from engaging in substantial gainful activity, the crucial factor in the case is what facts were contained in Dr. Roland's report and what weight is to be given his report. For it is to be emphasized that if Dr. Roland's report does not constitute substantial evidence that appellant was not disabled within the meaning of the Act, the evidence of the other physicians and the testimony of appellant himself constituted substantial evidence that appellant was so disabled.

In sum, then, to repeat in brief compass his findings, Dr. Roland's first report, dated May 5, 1958, mentioned appellant's complaints of pain and reported that, as of August 1957, appellant suffered "tenderness at the left gluteus maximus insertion with some consequence of discomfort on passive or active manipulation of left hip and lower extremity." Dr. Roland's clinical impression was: Contusion and strain at the left gluteus maximus attachment with probable bursitis at the distal insertion of the gluteus maximus. During two months, appellant was treated by Dr. Roland on four different occasions by injections of pain-relieving drugs. In his second report, dated October 10, 1958, Dr. Roland said that appellant's "findings," as of that date, were so dissimilar to the complaints and findings for which he had been previously treated, that he was asked to return to the office for another examination. At the time of such examination, Dr. Roland reported that appel-

lant "stated he had pain in the left hip which extended up his back from his left hip, and that this back pain began in February of 1958"; that this involved area comprised the entire thoracolumbar area; that appellant described the pain as extending down the left leg to all the toes of his left foot; that he further stated he used a cane to prevent falling and to prevent his left knee from buckling; that he had been under the care of Dr. Paul Bryan since February 1958; that forward flexion of the back is executed to thirty degrees, and that appellant complained of pain in his left hip on this maneuver; that neurological examination of the lower extremities shows his right ankle jerk to be greater in amplitude than the left, possibly indicating some diminution of the left ankle jerk; that "sensory examination shows a 'stocking' hypethesia (slight insensibility to touch) over the entire left leg, extending as high as the left inguinal ligament"; that the circumferential measurements show three-fourths inch atrophy of the left calf and one-fourth inch atrophy of the left thigh; that examination of the left hip shows flexion approximately 90 degrees and other motions of the left hip, including extension, internal rotation, external rotation, abduction and adduction, are approximately 50 per cent of normal; that the patient's voluntary resistance to these maneuvers prevents carrying the joint through a range which Dr. Roland thought the joint would allow; that straight-leg-raising tests were positive on the right at 80 degrees, and on the left at 20 degrees. In X-ray examinations, according to Dr. Roland, the only abnormality was evidence of mild osteoarthritis changes in the knee joint, as evidenced by marginal spurring in the upper and lower poles of the patella in the lateral view. In his "summary" Dr. Roland stated: "I find no evidence of permanent partial disability, and very little objective evidence of disability at the present time."

However, all of the foregoing report of Dr. Roland that he found no evidence of permanent partial disability and little

objective evidence of any disability, has no weight whatever in this case, and certainly cannot be considered by this Court as evidence sustaining the Secretary's decision because of one important reason: The Hearing Examiner came to the conclusion that he could not attach any importance to this evidence; that he completely disregarded it; that he made findings directly contrary to Dr. Roland's report; and that the Appeals Council affirmed the Hearing Examiner.

Instead of following Dr. Roland's report that there was little evidence of appellant Rice's permanent partial disability, and little objective evidence of any disability, the Hearing Examiner found "limitation of motion and physical distress and that *as a result, he is unable to resume his previous occupation as a stationary engineer or engage in any* other similar employment." This finding and decision can, in no way, be reconciled with Dr. Roland's report. The decision is similar to a special verdict of a jury where conflicting evidence is submitted by the government and the appellant, and in which the jury finds against the government.

Accordingly, the above-mentioned finding and decision of the Hearing Examiner, affirmed by the Appeals Council, are directly contrary to Dr. Roland's opinion that there was no evidence of partial permanent disability, or very little objective evidence of any disability. The Hearing Examiner and the Appeals Council by their finding and decision, completely discount and cancel out Dr. Roland's report, and, with that report removed from the case as a basis of decision of the Hearing Examiner and Appeals Council, we turn to examine the remaining evidence of appellant's complete disability hereinafter set forth.

First we discuss the report of the Hearing Examiner, upon which appellee bases his case. That report sets forth the following:

"In order to qualify for a disability under the Social Security Act, however, an applicant must be disabled for his usual occupation *and* any other type of substantial gainful activity. Although his ability to do strenuous work, particularly requiring him to stand over extended periods or get about, has evidently been affected, there has been no showing that his impairments are of such severity as to preclude him from engaging in sedentary employment."

In contradiction of the foregoing, it appears that there was a clear showing (aside from Dr. Roland's report, which the Hearing Examiner rejected) which disclosed that appellant's impairments were of such severity as to preclude him from engaging in substantial gainful activity, even of a sedentary nature. This clear showing of such physical impairment is as follows:

The positive evidence of hip and spine disease, shown by straight-leg-raising tests, as mentioned in the Hearing Examiner's Decision; the traumatic arthritis of the hip, which was treated weekly by Dr. Bryan; the limited and painful flexion of the left hip and knee, the atrophy of the left leg muscles, and limitation of motion at the left hip and in the lumbosacral spine, reported by Dr. Eastridge; and obvious distress in walking observed by Dr. Burns; and pain and agony testified to by appellant, as well as his testimony that he was unable to perform the lightest kind of work, which the Union Carbide Company assigned to him, in order that he could continue in employment for another five years until he would be entitled to pension rights.

To the foregoing should be added the facts that on June 30, 1958, in the "Disability Determination-State Agency" for the "Department of Health, Education and Welfare," the Disability Counselor and the Medical Consultant reported that medical evidence of appellant on May 12, 1958, and May 21, 1958, revealed "pain in back on sitting"; and on August 11, 1958, the "Claims Rep. Trainee" reported that, on that day, appellant, in bringing a sealed report of Dr. Eastridge to the office, "stood, because of pain, during

his entire time in the office," and further stated: "This individual seems in a great deal of pain," and that "his face is extremely flushed and broken blood vessels visible over entire face. Little use of left leg noted. Walks with cane slowly." This is evidence introduced on behalf of appellee Secretary.

In addition to the above injury, the undisputed evidence shows that appellant suffers from hypertension, and the lowest functional cardiac capacity of the four recognized classifications, that is, *complete* limitation of physical activity, acute respiratory attacks, dyspnea, or difficult and painful breathing, on moderate exertion; and that his use of cortisone to remedy the pain resulting from his traumatic arthritis, was prohibited because of his high blood pressure.

Claimant in his own testimony repeatedly emphasized that he can sit for only a short time because in this position he has such severe pain in his back, and hip, and must either stand up or lie down to lessen the pain; and appellee does not question this evidence.

Moreover, there is the evidence of Dr. Bryan, the appellant's regular physician, and the evidence of Dr. Eastridge, that, from their observation and treatment, appellant was entirely unable to work, and was "totally and permanently disabled therefrom." [1]

All of this affirmative evidence shows appellant is unable to perform any substantial gainful activity, although the burden is not upon the appellant to show this fact.

The Hearing Examiner's report continues:

"The formal education of the claimant who is 55 years of age is limited to elementary school. The hearing examiner was favorably impressed with his neat appearance; he was also well-spoken and appeared to have a good command of the language. He held high public office in his community over a long period of time despite the fact that he never had the advantage of higher education. This tends to indicate that he has sufficient native intelligence and initiative to adjust himself to a type of employment which may differ from what he has heretofore been accustomed to. There are many forms of sedentary work which do not require highly specialized

---

1. Judge Weick, writing for this court recently in Hall v. Celebrezze, 314 F.2d 686, had occasion to review the authorities with regard to opinion evidence of physical disability. In that opinion it was said:

"Wigmore states:

" 'Opinions as to physical disability to pursue an occupation, under the Federal statutes for War-veterans and under accident insurance policies, here involve the additional risk of being an improper opinion as to the legal effect of the statutory or contractual phrase. But since those phrases are also common in general popular usage, the Opinion rule ought not to stand in the way of opinions offered by persons having the requisite knowledge of the party's physical condition.' Wigmore on Evidence, 3rd ed. § 1975, p. 120.

"In Tackett v. Eastern Coal Corp., 295 Ky. 422, 174 S.W.2d 707 the court said:

" 'The percentage of disability cannot be fixed with mathematical accuracy, but opinions by medical experts based on examinations made by them are competent.'

"In United States v. Calvey, 110 F. 2d 327 (C.A.3) a physician was permitted to testify that the patient was disabled 'from doing any kind of work.' In United States v. Cannon, 116 F.2d 567 (C.A.1), it was held proper for a doctor to testify that disability was total and permanent. See also: Rowe v. Gatke Corp., 126 F.2d 61 (C.A.7); Corrigan v. United States, 82 F.2d 106 (C.A.9).

"It was not necessary that Hall be bedridden or wholly helpless in order to establish his claim for benefits. Berry v. United States, 312 U.S. 450, 455, 61 S.Ct. 637, 85 L.Ed. 945; Cf. Everhart v. State Life Ins. Co., 154 F.2d 347 (C.A.6); Mutual Life Ins. Co. [of New York] v. Bryant, 296 Ky. 815, 177 S.W.2d 588, 153 A.L.R. 422 and Gibbons v. Metropolitan Life Ins. Co., 135 Ohio St. 481, 21 N.E.2d 588."

skills and are within the claimant's capabilities." [2]

There is no proof whatever that there are many forms of sedentary work which are within the claimant's capabilities; and such proof must be produced by the government, and, in this case, the government is required to submit such proof— and not only submit proof, but to carry the burden of proof, as hereafter appears from many adjudications. What kind of sedentary work is within appellant's capabilities? His education stopped before he had completed the third grade; his previous work experience consisted of cutting lawns, doing odd jobs, and a little plumbing, which he had "picked up;" and, finally, acting as a stationary engineer at the Union Carbide Chemicals Company. It is true that he had been elected a member of the City Council of Catlettsburg, Kentucky,—a small town of thirty-eight hundred inhabitants,—for terms aggregating six years, and had thereafter been elected and reelected Mayor of that city during an eleven-year period. It can be assumed, as found by the Hearing Examiner, that appellant was neat in his appearance and well-spoken. None of these qualities give rise to any inference that, with his injury, pain, suffering, and work experience, there was any kind of sedentary employment available to him or within his capabilities. Appellant knew of no such kind of employment; his counsel knew of none; the members of this Court know of none; and, as far as appears from the evidence, the Hearing Examiner and the Appeals Council know of none. The fact that a man is elected repeatedly for six years as a member of a Council in a little town, and as Mayor for a period of eleven years,—which office he gave up at the

---

2. In Hall v. Celebrezze, supra, where this court had previously reversed the judgment and remanded the case to the Secretary in order that further evidence be taken and findings made on the issue of what the claimant could do, and what work opportunities were available for a person in his condition, the Appeals Council, on the second hearing, determined from a booklet issued by the Department of Labor, entitled "Estimates of Worker Trait Requirements for 4,000 Jobs as defined in the Dictionary of Occupational Titles," that claimant was able to perform many light jobs, saying:

"With his skills and experience, it would not have been difficult for the claimant to engage in work requiring similar or related skills, but making few physical demands upon him. There are numerous examples of sedentary and semi-sedentary job classifications to which he could have transferred his skill in drawing, reading blueprints, shaping clay, making plaster molds, using handtools for cutting, fitting, shaping and assembling small parts made from wood or related material, and inspecting and testing patterns for accuracy. U. S. Dept. of Labor, 'Dictionary of Occupational Titles,' Vol. 1 (2d ed. 1949) and Part IV (rev. 1944); id., 'Estimate of Work Traits,' supra. Such examples include the following: caster, pottery and porcelain industry; finisher, pottery and porcelain industry; paster, brick and tile industry; millman, brick and tile industry; Plaster-of-paris molder (making patterns for electrical equipment); smoking pipe maker; stock maker for guns; toy maker, wood; and wood letter carver. Many others require fewer skills."

In commenting upon the above statement of the Appeals Council, this court said: "There was no evidence that Mr. Hall had skill in drawing or reading blue prints. In making drawings, Hall had copied them from a book. The other examples of job classifications referred to required physical effort or manual labor which the uncontradicted evidence shows he was unable to perform and was advised against doing so by his doctors"; and in the foregoing opinion, this court thereupon reversed the judgment in Hall v. Celebrezze and remanded it with instructions to allow disability benefits.

It is to be noted that in the instant case, the Hearing Examiner and the Appeals Council did not even refer to the booklet entitled "Estimates for Worker Trait Requirements for 4,000 Jobs as defined in the Dictionary of Occupational Titles," and did not suggest what jobs appellant could do, as did the Appeals Council in Hall v. Celebrezze, but contented itself with approving the general statement that: "There are many forms of sedentary work which do not require highly specialized skills, and are within the claimant's capabilities."

time of his injury—does not indicate that he can engage in substantial gainful activity of a sedentary or other nature when suffering from the injuries that appellant suffers. A man may be so elected to public office on the basis of his honesty, popularity, or common sense—or for all of these qualities—but to say that an injured man, with such qualifications of honesty, popularity or common sense, is capable of substantial gainful activity, does not follow. The general statement, without any proof, that appellant can perform many forms of sedentary work, without disclosing any knowledge on the part of the Hearing Examiner or the Appeals Council of what that sedentary work could be, cannot detract from appellant's claim, because the law places *the burden of proof upon the government, and not upon appellant, to show that he was able to perform some kind of substantial gainful activity.*

Because of appellee's failure to carry the burden of proof to show appellant was able to perform some kind of substantial gainful activity, appellant is entitled to prevail on his proofs that he is totally disabled for any substantial gainful activity.

"Under the Social Security Act, unlike some other statutes, it is not the burden of the claimant to introduce evidence which negatives every imaginable job open to men with his impairment, and of his age, experience and education. It is quite enough if he offers evidence of what he has done, of his inability to do that kind of work any longer, and, of his lack of particular experience for any other type of job. *If there are other kinds of work which are available and for which the claimant is suited, it is the defendant's burden to adduce some evidence from which a finding can be made that he can do some type work; actually, not apparently. * * * Here, the Referee has made no such finding, whatsoever, based on evidence.*" Ellerman v. Flemming, D.C., 188 F.Supp. 521, 527. (Emphasis supplied.)

"[The Claimant] was not required by the use of a catalogue of the nation's industrial occupations to go down the list and verbally negative his capacity for each of them or their availability to him as an actual opportunity for employment." Butler v. Flemming, 288 F.2d 591, 595 (C.A.5).

"[The] test of a claimant's disability or inability to engage in any substantial gainful activity is a subjective one and claimant need not establish complete absence of any opportunity for substantial gainful employment and he need only establish that he has become disabled from employment in any work in which he could profitably seek employment in light of his physical and mental capacities and his education, training and experience and he need not be totally helpless or bedridden." Randall v. Flemming, D.C., 192 F.Supp. 111.

In the light of the foregoing, we are of the view that the conclusion of appellee that appellant is capable of carrying on substantial gainful activity is unsupported by the evidence; that the burden was on the appellee to introduce some evidence from which a finding could be made that appellant could engage in same kind of substantial gainful employment. Ellerman v. Flemming, supra; and that appellee failed to sustain this burden of proof. As was said in Jarvis v. Ribicoff, 6 Cir., 312 F.2d 707, "Unless we are to overrule the foregoing cases, including our own adjudication in Hall v. Flemming, 6 Cir., 289 F.2d 290, we must hold that appellee did not discharge the burden placed upon him, and that appellant is entitled to recover on his proofs." It is our conclusion, therefore, that the findings of the Administrator that appellant was not entitled to disability benefits were not supported by substantial evidence.

The judgment is accordingly reversed and the case is remanded to the Secretary of Health, Education and Welfare with directions that appellant be granted a period of disability and disability benefits in accordance with the Social Security Act.