File Name: 06a0458n.06
Filed: June 29, 2006

NOT RECOMMENDED FOR PUBLICATION

No. 05-6549

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| GERRY E. BINGAMAN, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT COURT |
| | ) | FOR THE EASTERN DISTRICT OF |
| COMMISSIONER OF SOCIAL SECURITY, | ) | KENTUCKY |
| | ) | |
| Defendant-Appellee. | ) | |
| _____) | | OPINION |

**Before:  GILMAN and GRIFFIN, Circuit Judges; and DUGGAN, District Judge[*]**

**PATRICK J. DUGGAN, District Judge.**  Gerry E. Bingaman ("Bingaman" or "Claimant")

applied for and was denied disability insurance benefits and Supplemental Security Income under

Titles II and XVI of the Social Security Act.  The district court affirmed the adverse decision of the

Administrative Law Judge (ALJ).  Bingaman appeals that ruling, claiming that (1) his impairments

meet or equal the Listing of Impairments, (2) the ALJ's finding that Bingaman can perform work

within his residual functional capacity is not supported by substantial evidence; rather, the ALJ

made residual functional capacity findings based on his own, unaided interpretation of medical data;

and (3) in determining Bingaman's residual functional capacity, the ALJ failed to accord proper

---

[*]The Honorable Patrick J. Duggan, Senior United States District Judge for the Eastern District of Michigan, sitting by designation.

weight to the determination of the treating physician. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## I. BACKGROUND

### A. Factual background

Bingaman was born on March 21, 1956, and was forty-seven years old at the time of his hearing before the ALJ. He completed high school and is able to read, write, and do simple math. Bingaman has previously worked as a utility technician and a freezer operator. He last worked as a truck scale technician for Procter & Gamble Co., doing data entry. He has not worked since February 2000.

In 1980, Bingaman sustained a gunshot wound to his lower back. The bullet could not be removed because it was located behind the sciatic nerve. In 1990, Bingaman fractured his left calcaneus, or heel bone, which was surgically repaired with hardware. In 1998, Bingaman underwent a second surgery to remove the hardware from his heel. After the hardware was removed, Bingaman developed arthritis in the calcaneus, which affected his ability to stand, walk, bend, stoop, squat, and climb ladders and stairs.

In January 1999, Dr. Wayne Amendt evaluated Bingaman for complaints of consistent foot pain. Dr. Amendt placed work restrictions on claimant and instructed him not to walk over fifteen minutes at a time or more than one hour each day, not to lift over ten pounds, not to stand over five minutes without a break and not to climb.

Bingaman continued to experience back pain, which his doctors believed was exacerbated by his limping due to his calcaneous fracture. A November 2000 MRI revealed degenerative disc disease with minimal bulging at T11-12, L3-4, L4-5, and L5-S1, but there was no significant nerve root impairment. Moreover, since 1998, Bingaman has experienced neck pain, which has contributed to hand, wrist, and arm weaknesses, as well as gripping problems. He also has problems with dizziness, severe headaches, blurred vision, breathing, depression, anxiety, insomnia, and irritability with his family.

Bingaman continued to work as a truck scale technician until February 8, 2000, when he alleges an onset of disability. In a report dated February 8, 2000, Dr. Amendt stated that Bingaman was unable to work because of his foot problems.

## B.      Procedural background

Bingaman filed an application for disability insurance benefits and Supplemental Security Income benefits on August 24, 2000. He alleged disability as of February 9, 2000. His application was denied initially and upon reconsideration by the Social Security Administration. Following a hearing held on July 2, 2002, the ALJ issued a decision on July 24, 2002, denying the claim for benefits. The Appeals Council denied Bingaman's request for review, and he appealed to the United States District Court for the Eastern District of Kentucky. On May 28, 2003, the district court granted the Commissioner's motion to remand the matter to the Commissioner because the tape of the hearing held on July 2, 2002, was blank and could not be transcribed.

On November 10, 2003, Bingaman and a vocational expert appeared before the ALJ for a second hearing. On March 24, 2004, the ALJ again denied the claim for benefits. The case returned to the district court and, on August 2, 2005, the district court affirmed the Commissioner's denial of benefits. This appeal followed.

## II. ANALYSIS

### A. Standard of review

Under 42 U.S.C. § 405(g), the ALJ's findings are conclusive so long as they are supported by substantial evidence. Our review "is limited to determining whether there is substantial evidence in the record to support the findings." *Duncan v. Sec'y of Health and Human Servs.*, 801 F.2d 847, 851 (6th Cir. 1986). The substantial evidence standard is met if a "reasonable mind might accept the relevant evidence as adequate to support a conclusion." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (citations omitted). Furthermore, if substantial evidence supports the Commissioner's decision, we must defer to that finding "even if there is substantial evidence in the record that would have supported an opposite conclusion." *Id.*

### B. Legal framework for evaluating disability claims

A five-step inquiry is employed by administrative law judges to determine whether a claimant is disabled within the meaning of the Social Security Act. 20 C.F.R. § 404.1520. First, the claimant must show that he is not engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b). Second, the claimant must demonstrate that he has a "severe impairment." 20 C.F.R. § 404.1520(c).

Third, to be found "disabled," the claimant must then demonstrate that his impairment meets the durational requirement and "meets or equals a listed impairment." 20 C.F.R. § 404.1520(d). If the impairment does not meet or equal a listed impairment, the fourth step requires the claimant to prove that he is incapable of performing work that he has done in the past. 20 C.F.R. § 404.1520(e). Finally, if the claimant's impairment is so severe as to preclude the performance of past work, then other factors, including age, education, past work experience, and residual functional capacity, must be considered to determine if other work can be performed. 20 C.F.R. § 404.1520(f). The Commissioner bears the burden of proof at the final step. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003).

## C.    Listing 1.03 determination

Bingaman argues that the ALJ erred by failing to find that his impairment meets or equals Listing 1.03, which requires evidence of "[r]econstructive surgery or surgical arthrodesis of a major weight-bearing joint, with inability to ambulate effectively, as defined in 1.00B2b . . . ." Listing 1.00B2b provides:

> (1) *Definition*. Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities . . . .

> (2) To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include but are not limited to, the inability to walk without the use of a

walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping or banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of an assistive device does not, in and of itself, constitute effective ambulation.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00B2b.

Bingaman argues the ALJ erred in finding that Bingaman did not meet Listing 1.03 despite the fact that: (1) Claimant could only stand and walk for fifteen minutes at a time and then must sit for five minutes, and (2) Claimant only goes grocery shopping with the assistance of his wife. As noted above, Bingaman bears the burden of demonstrating that his impairment meets or equals Listing 1.03.

Substantial evidence exists to support the ALJ's conclusion that Bingaman does not meet Listing 1.03. Although Bingaman has a "slight limp, favoring the left foot," he does not require a hand-held assistive device to walk. At the hearing, Bingaman testified that despite some difficulty, on an average day he was able to perform household chores such as cleaning, cooking, washing dishes, and doing laundry. He also testified that he was able to mow the lawn with a riding mower and vacuum the house. Therefore, Bingaman failed to meet his burden of proving that his impairment meets the requirements of Listing 1.03.

## D. Residual functional capacity finding

Bingaman next claims that the ALJ's finding that Bingaman can perform work within his residual functional capacity ("RFC") is not supported by substantial evidence and Plaintiff is entitled to reversal at Step 5.

The ALJ posed two hypothetical questions to the vocational expert.  First, consistent with

the ALJ's ultimate RFC finding, the ALJ asked:

> Okay.  All right, would you assume, please, an individual of the same age, education, and work experience as the claimant, with the following limitations:  The individual can lift, carry, push and pull up to 10 pounds occasionally and five frequently; can, in combination, stand and/or walk up to two hours in an eight hour workday, and up to 15 minutes at a time, after which he'd need to be able to sit for at least five minutes; the individual can sit for up to two hours at a time, after which he must be able to stand or walk for at least five minutes; the individual can occasionally stoop, kneel, crouch, and climb ramps and stairs; cannot crawl, or climb ladders, ropes or scaffolds, or use the left leg to operate controls or perform other forceful work; no more than occasional firm, forceful gripping with the hands, by which I don't mean to exclude the fine or gross manipulation or general handling that doesn't involve forceful gripping; no more than occasional work above the shoulder level with the upper extremities; no operating automotive equipment or working at unprotected heights or around hazardous machinery; the individual is unable to remember or carry out detailed instructions; and no more than occasional interaction with the general public.

After the vocational expert indicated that such an individual could not perform any of

Claimant's past work, the expert found that the hypothetical individual could perform types of two

sedentary jobs that exist in the national and local economy.

In the ALJ's second hypothetical, he asked whether any jobs were available to an individual

of the same age, education, and work experience as the Claimant with the characteristics described

in the RFC form completed by Dr. Allnutt, Bingaman's treating physician.  After evaluating

Bingaman on November 7, 2003, Dr. Allnutt found:  Bingaman could lift and carry ten pounds

occasionally; stand and walk for an hour total during a workday and just five minutes at a time; sit

for a total of five to six hours during the workday for twenty minutes at a time; perform no postural

activities; that he was restricted in reaching, handling, feeling, pushing/pulling; and that he was

7

restricted from heights, moving machinery, dust, and vibrations. Taking into account Dr. Allnutt's RFC form, the vocational expert found that such an individual could not perform Claimant's past work nor any other work.

First, Bingaman argues that the ALJ erred in making RFC findings based on his own, unaided interpretation of medical data. *See Hall v. Celebrezze*, 314 F.2d 686, 690 (6th Cir. 1963) (finding that the Secretary of Health may not supplant his own opinions regarding physical disabilities for those of the uncontradicted medical experts). Bingaman contends that the following excerpt from the ALJ's opinion reveals that the ALJ, without the aid of a medical advisor, made RFC findings based upon his own interpretation of medical data:

> In combination with his degenerative disc disease, his ability to perform postural activities is also reduced, but not completely precluded. *Objective radiographic studies fail to show findings which would support more restrictive limitations. An MRI from November 2000 showed degenerative disc disease but with only minimal bulging at several levels . . . .*

(Emphasis added).

Although in this section of the ALJ's opinion, he did not specifically attribute these findings to medical professionals, earlier in the opinion, the ALJ explained:

> [Claimant] was seen by Dr. Hoblitzell in September 2000. At that time, the claimant was felt to have chronic lower back strain, exacerbated by his limping due to his calcaneal fracture. Dr. Hoblitzell performed EMG studies in October 2000 which showed the possibility of mild left S1 radiculopathy. These studies showed no evidence of carpal tunnel syndrome, ulnar neuropathy, radiculopathy or plexopathy of the upper extremities.

> Exhibits 6F and 24F are the medical reports and EMG studies of Dr. Richard Hoblitzell. Dr.

Hoblitzell's EMG studies revealed that there was "minimal bulging" at T11-12, L3-4, L4-5, and L5-

S1. Moreover, Dr. Hoblitzell stated that Bingaman's "EMG studies of the upper extremities reveal no significant abnormalities" and the "EMG studies of the lower extremities show[] perhaps a mild left S1 radiculopathy." Dr. Hoblitzell also found that Bingaman's "MRI scan shows some degenerative disc in his lumbar spine, but no significant nerve root impingement." Therefore, the ALJ did not improperly interpret the medical data in the record when he found only minimal bulging at several discs.

Second, Bingaman argues that Dr. Allnutt's RFC is entitled to "controlling weight" because Dr. Allnutt was a treating physician who treated Bingaman during the entire period of claimed disability. *See Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985) ("The medical opinions and diagnoses of treating physicians are generally accorded substantial deference, and if the opinions are uncontradicted, complete deference.").

The ALJ is ultimately responsible for determining a claimant's RFC based on relevant medical and other evidence in the record. *See* 20 C.F.R. § 404.1546(c), § 404.1545(a)(3). The evidence submitted by the claimant may contain medical opinions. 20 C.F.R. § 404.1527(a)(2). Acceptable medical sources, such as physicians or psychologists, can provide evidence to establish whether a claimant has medically determinable impairments. 20 C.F.R. § 404.1513(a). Although the opinion of a treating physician is generally accorded great weight, such deference applies only where the physician's opinion is based upon sufficient medical data. *Miller v. Sec'y of Health and Human Servs.*, 843 F.2d 221, 224 (6th Cir. 1988). The ALJ must provide "good reasons" for a

decision not to give controlling weight to the treating physician's opinion. *See* 20 C.F.R. §

404.1527(d)(2); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 545 (6th Cir. 2004).

In this case, the ALJ found that "the objective evidence in this record simply does not

support disabling impairment in this case." The ALJ adequately explained why he did not give

controlling weight to Dr. Allnutt's opinions: the opinions were inconsistent with both another

treating physician's opinion and other evidence in the record. The ALJ reasoned:

> Current neurosurgical consultation by Dr. Mullen in November 2003 failed to show findings to support limited functioning. He had good range of motion, intact reflexes, and no focal upper extremity weakness or atrophy.[1]

The ALJ further reasoned that Dr. Mullen's findings "refute many of the claimant's

complaints."

> The undersigned also carefully considered medical assessments submitted by Dr. Allnutt, a treating source. These assessments show limitations somewhat more restrictive than the above-described residual functional capacity. These assessments are not adopted as they are inconsistent with each other with respect to the ability to sit, with one stating the claimant can sit for a total of five or six hours or 20 minutes without interruption and the other stating the claimant can sit a total of six or seven

---

[1]Claimant contends that this is another instance where the ALJ improperly substituted his own interpretation of the medical data for the opinion of the medical professional. However, Dr. Mullen explicitly found:

> The neck is supple with full range of motion. There is no thyroid enlargement. There is no lymphadenopathy or cartoid bruits. He has good range of motion of his neck and is able to lift his arms above the horizontal at the shoulder. There is no focal upper extremity weakness, and no atrophy of his upper extremity musculature. . . . There is no lower extremity motor weakness or atrophy. He has intact posterior tibalis pulses. There is no edema of the ankles. He is able to ambulate without antalgia and there is no evidence of cerebellar ataxia. . . .
>
> A cervical MRI scan reveals very minimal discogenic changes at C5-6. I do not appreciate a surgical lesion on that imaging study.

Consequently, the ALJ's assertion that Dr. Mullen's November 2003 consultation fails to support limited functioning is supported by substantial evidence in the record.

hours or 15 minutes at a time. There is no explanation for this change in the functional capacity assessed. Nor is there any documentation in the medical records showing why this would be so. Further, his assessment is not supported by the objective evidence. As noted above, radiographic examination has shown mostly mild findings with respect to his cervical and lumbar spines. Further, EMG and nerve conduction studies have generally shown negative results. Current neurologic examination by Dr. Mullen also shows lack of specific pathology which would support the level of limitation found in these assessments.

Although we do not find that there is a significant inconsistency in these assessments, the ALJ went on to note that both the objective medical studies and another doctor contradicted Dr. Allnutt's assessment:

> Further, [Dr. Allnutt's] assessment is not supported by the objective evidence. As noted above, radiographic examination has shown mostly mild findings with respect to his cervical and lumbar spines. Further, EMG and nerve conduction studies have generally shown negative results. Current neurologic examination by Dr. Mullen also shows lack of specific pathology which would support the level of limitation found in these assessments.

Because the ALJ found that both objective medical studies and Dr. Mullen's findings contradicted Dr. Allnutt's findings, the ALJ did not err as a matter of law by choosing not to accord Dr. Allnutt's RFC controlling weight. *See Miller*, 843 F.2d at 224. Therefore, substantial evidence supports the ALJ's RFC determination.

## III. CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.