Harold **HENNINGER**, Plaintiff-Appellant,

v.

Anthony J. **CELEBREZZE**, Secretary of Health, Education and Welfare, Defendant-Appellee.

No. 15868.

United States Court of Appeals Sixth Circuit.

Aug. 11, 1965.

James J. Carras, Bay City, Mich., for appellant.

Mona S. Lambird, Department of Justice, Washington, D. C., John W. Douglas, Asst. Atty. Gen., Alan S. Rosenthal, Atty., Department of Justice, Washington, D. C., Lawrence Gubow, U. S. Atty., Bay City, Mich., on brief, for appellee.

Before WEICK, Chief Judge, O'SULLIVAN, Circuit Judge, and McALLISTER, Senior Circuit Judge.

McALLISTER, Senior Circuit Judge.

Appellant's claim for disability benefits under the Social Security Act, Title 42 U.S.C.A., Section 405(g), was denied by the Hearing Examiner, and after consideration by the Appeals Council, the Secretary of Health, Education and Welfare adopted the Hearing Examiner's findings. The district court affirmed the decision of the Secretary, and appellant seeks review.

The facts are as follows: On June 19, 1960, appellant was injured in an automobile collision. At the time of the accident, he was forty-three years old, and had been working steadily for twelve years as a molder in a foundry in Saginaw, Michigan. He had been divorced from his wife, but had received the custody of their three children who were living with him at the time of his injury, and who are now living with him in the home of his father and mother. His father was eighty years old at the time of the hearing on June 20, 1962, and his mother was seventy-eight years old.

Appellant claims he is totally disabled from performing any substantial gainful employment. He was examined in several hospitals by a number of physicians.

Dr. Treadway, appellant's family physician, diagnosed his condition as resulting from questionable cartilagenous injury to the anterior inferior chest wall; that he also had symptoms of chest, neck, and back pain which dated from the time of the automobile accident; and Dr. Treadway further diagnosed appellant's condition as spondylolisthesis, L5 (fifth lumbar vertebra); a defect in the posterior appendage; a marked increase of the lumbo sacral joint angle; and the doctor's opinion was that appellant's condition was static. He prescribed pain-killing drugs and restricted appellant from any lifting or straining.

Dr. Neal R. Moore, of Bay City, Michigan, treated appellant for approximately five months, between November 1960, and April 6, 1961, seeing him every two weeks during that period. In his report filed with the Department of Health, Education and Welfare, Dr. Moore described appellant's subjective symptoms as "Pain in the low back and in the left buttocks and lateral aspect of the left thigh and painful limp on left." Under the heading of "Objective Findings," Dr. Moore stated: "All of the objective findings leading to a clinical diagnosis of a fixed protrusion." His diagnosis was "Fixed protrusion intervertebral disc at the lumbo-sacral joint level, centrally displaced and displaced to the left." His treatment for appellant was described as "Hospitalized for traction treatment. Home physical therapy." Dr. Moore concluded his report to the Department of Health, Education and Welfare by stating that appellant's condition was one of "Total disability."

Dr. Treadway, above mentioned, had noted in his report that Dr. James S. Campbell, of Bay City, Michigan, had seen appellant in orthopedic consultation and that he desired the Department of Health, Education and Welfare to consult Dr. Campbell on the nature of appellant's limitations in detail. To this request, the Department apparently agreed; and a medical report was secured from Dr. Campbell in which it was stated that, at the request of Dr. Treadway, he had examined appellant on February 10, 1961, and on May 2, 1961, because of persistent low back pain follow-

ing the accident of June 19, 1960. Dr. Campbell, in his report stated:

"He was involved in an accident at the corner of John and Linn Streets and incurred multiple injuries including 'a crushed left chest, torn cartilages and bruises of the left arm' and noted at that time that he could not walk on his left foot. Since the accident *he has noted persistent low back pain with numbness in the left arm with occasional right sciatic pain to the knee.* His injuries caused him to be confined to the hospital for eleven days *and since then he has noted constant low back pain gradually getting worse.*

"Examination revealed good range of motion of the cervical spine without pain. Neurological examination of the upper extremities was negative. *The low back area revealed increased lumbar lordosis and a slight right pelvic tilt secondary to some shortening of the right lower extremity.* Straight leg raising was positive on the left at fifty degrees. Knee and ankle reflexes were active and equal and *there was a left first sacral hypoesthasia* [numbness], *but no motor weakness.*

"X-rays of the lumbar spine, made October 19, 1960, at Samaritan Hospital, were reviewed revealing a *Spondylolisthesis with forward displacement of the fifth lumbar body on the sacrum.* There was no evidence of bony injury noted.

"I have seen Mr. Henninger on only this one occasion but feel that if he is still having trouble that *a chair-back brace may possibly be helpful, and if this were not sufficient on Arthrodesis of the lower lumbar spine to the sacrum might be indicated. It would appear that he had incurred a sprain of the lumbo sacral area through an unstable joint, this instability, congenital in nature, causing symptoms of low back instability to persist.*" (Emphasis supplied.)

The treatment above suggested by Dr. Campbell, was that, if the chair-back brace might not be helpful, an arthrodesis, or surgical fusion of the vertebrae, might be the proper remedy—and was the only other remedy suggested by Dr. Campbell.

In addition to the foregoing medical examinations and treatments, Dr. Donald C. Durman, an orthopedic surgeon, examined appellant at the request of the Social Security Administration. Appellee Secretary attaches much importance to Dr. Durman's report to the effect that some of the findings revealed by the doctor's physical examination were incompatible or inconsistent with appellant's complaints, giving as an instance, that if it were true that appellant had no sensation in the front left side of his leg to the height of the iliac crest, there *should* similarly be a lack of sensation on the left side of the back "up to about the lumbo dorsal level"—and that "No such lack of sensation was detected by Dr. Durman." Also, appellee points out that, while appellant was walking with a cane when he saw Dr. Durman, *"As far as Dr. Durman was able to determine* appellant could walk just as well without a cane as with it." (Emphasis supplied.)

The foregoing observations of Dr. Durman, and the importance attached to them by the Secretary, completely evaporate, however, when Dr. Durman really gets down to the business of examining appellant by X-ray and actually determining what was the matter with him. First, Dr. Durman finds that the front and side views of the X-ray films disclosed defects of the fifth lumbar vertebra and a forward displacement of that vertebra on the first sacral body.

Dr. Durman, in this regard, reported:

"X-ray examination of the lumbo sacral spine is made. The anteroposterior view shows a very low set fifth lumbar vertebra. There appear to be *bilateral defects* in the neural arch of the fifth lumbar vertebra and complete asymmetry of the facets between L-4 and L-5. The

lateral view reveals marked increase in the angulation of the sacrum. The posterior part of the fifth lumbar vertebral body appears to be considerable forward on the first sacral body. The facets between L–5 and S–1 are not visualized in this view.

*"This man has a congenital anomaly of the fifth lumbar vertebra with spondylolisthesis.* What relation the accident of June 19, 1960 has to the *present symptoms is rather difficult to evaluate.* In view of the *physical findings and the X-ray findings* the patient might be expected to have the *present symptoms as a result of the mechanical defect of the lumbo sacral region and independent of any injury.*

"While he has some other symptoms which could not possibly be related to injury and while it is my impression that he is over emphasizing his complaints, I still feel that *he has sufficient evidence of a rather severe low back condition to warrant treatment if it is desired and which should probably include a lumbo sacral fusion,* although a period of conservative treatment might be tried." (Emphasis supplied.)

It will be noted that Dr. Durman reported that in view of some of appellant's physical findings and X-ray findings, he "might be expected to have the present symptoms as a result of the mechanical defect of the lumbo sacral region and independent of any injury." In this, Dr. Durman was apparently proceeding on the theory that appellant was attempting to recover for injuries resulting from the accident, as in a personal injury case, rather than because of disability arising from whatever cause there might be—which appellant was entitled to do. Nevertheless, the concluding paragraph of Dr. Durman's report set forth, as above stated, that the view of the X-rays showed a number of serious spinal defects, and a recommendation of a lumbo sacral fusion.

After his claim had been denied by the "Reconsideration Bureau" on October 11, 1961, appellant was examined at the University of Michigan Hospital for various medical problems, including his back condition, at the request of the Social Security Administration, and Dr. William P. Work, who examined him at this time, in his report, insofar as here applicable, stated:

"Past medical history revealed no history of drug allergies or serious illnesses. The patient also is bothered with low back discomfort with radiation of pain down the back of his left leg, also noted during the past one and one-half years.

\* \* \* \* \* \*

"The patient was then referred to the Orthopedic Service for evaluation of his back pain. It was their impression that the patient has arthrogenic low back pain with possibly primary spondylolisthesis and that he also had shortening of the right leg with a pelvic tilt. It was their impression that the patient should have x-rays of his lumbosacral spine. These x-rays were ordered and showed some evidence of a first degree spondylolisthesis with asymmetry of the L–5 facets. There was good maintenance of the disc spaces.

"The Orthopedic Department recommended that the patient *wear a back brace* but it was their impression that the patient would not be motivated sufficiently to continue to be able to return to work wearing the brace. It was also felt that the patient would benefit by a ½ inch heel and sole on the right foot.

\* \* \* \* \* \*

"It is difficult to say when the patient will be able to return to work, but providing he follows the instructions as outlined by the Orthopedic Surgeons, it is felt that he could *conceivably* return to work in ap-

proximately one month." (Emphasis supplied.)

However, the Orthopedic Clinic which examined appellant at the University of Michigan Hospital, at the request of the Social Security Administration, through Dr. K. G. Campbell, reported:

"Mr. Henninger reports back stating that he has talked with his physicians and they have said that we could go ahead and try anything that we wanted to in regard to the problem of Mr. Henninger's low back pain.

"Mr. Henninger is also willing to try anything, yet he states that a brace will not work and he refuses surgery. However, I have explained to him that he would possibly be improved by wearing a flexion body jacket and he has agreed to this.

"Therefore, a flexion body jacket was applied today and I note that he stated he could not stand up straight and he walked much like a duck does with a broad-based waddling gait. He did not say he was any better or any worse following application of the body cast, *but he is a very difficult person to evaluate inasmuch as the overtones of the low back problem confuse accurate evaluation.*

"He was given a prescription for Darvon and he will return to see us in six weeks time. I have told him that if it was unbearable in the cast, he could return to his physician and have it removed. In the long run, I don't know what we can offer Mr. Henninger except that if the cast does [not] alleviate the pain, we can offer him spinal fusion."

Dr. Speir, of the Michigan Vocational Agency, wrote a "Disability Determination" for the Department of Health, Education and Welfare, although he never saw or examined appellant.

The sum of all the medical testimony introduced by both parties may be resolved briefly as follows:

Dr. Treadway diagnosed appellant's trouble as spondylolisthesis and other spinal defects; and restricted him from straining or lifting. He treated him with pain-killing drugs. Dr. Moore reported appellant had low back pain and pain in the left buttocks and left thigh. He treated him for "fixed protrusion intervertebral disc at the lumbo-sacral joint level, centrally displaced and displaced to the left"; and Dr. Moore reported that appellant, because of his impairment, was totally disabled. Dr. John S. Campbell found that appellant's low back area revealed increased lumbar lordosis, and other spinal ailments, including spondylolisthesis with forward displacement of the fifth lumbar vertebra. Dr. Campbell suggested that if a chair-back brace were not helpful to appellant, a surgical fusion of the vertebrae might be the remedy. Dr. Durman found defects of the spine and felt that appellant had such a severe low back condition as to warrant treatment which should include a lumbo sacral fusion. Dr. Work, of the University of Michigan Hospital, reported that appellant had arthrogenic low back pain and defects of the lumbo sacral spine; he recommended that the patient wear a back brace, and stated that while it was difficult to say when appellant could return to work, if he followed "instructions as outlined by the Orthopedic Surgeons, it is felt he could conceivably return to work in approximately one month." However, at the University of Michigan Hospital three weeks later, Dr. K. G. Campbell, who examined appellant, reported that he had applied a flexion jacket or cast to appellant; that appellant was a very difficult person to evaluate inasmuch as the overtones of the low back problem confuse accurate evaluation; that he told appellant that if the cast was unbearable, he could return and have it removed; and he further reported to the Department of Health, Education and Welfare that if the cast did not alleviate the pain, the only remaining treatment that they could offer was spinal fusion.

From the foregoing, it is to be noted that Dr. John S. Campbell, the orthopedic specialist, recommended a spinal fusion if the chair-back brace was not helpful; and the brace was not helpful. Dr. Durman and Dr. K. G. Campbell of the University of Michigan Hospital, also recommended spinal fusion, the latter in case the cast did not alleviate the pain; and the cast did not alleviate the pain.

Appellant used the brace which was recommended by Dr. Work of the University of Michigan Hospital; but he testified that he could not continue wearing it because of the pain it caused him. Dr. Work's report, which was three weeks prior to that of Dr. K. G. Campbell, stated that it was difficult to say when the appellant could return to work, but that if he followed the instructions outlined, that is, wearing a back brace and a one-half inch heel and sole on the right foot, "it is felt that he could *conceivably* return to work in approximately one month." (Emphasis supplied.) Dr. K. G. Campbell of the University of Michigan Hospital later applied a flexion body jacket or cast, but appellant could not sit comfortably in it, as he had to sit leaning forward as long as he could, and then as long as he was able, from side to side. Dr. Campbell himself expressed the idea that it was doubtful appellant could use the flexion body brace or cast in his statement that he told appellant that "if it was unbearable in the cast, he could return to his physician and have it removed"; and that if the cast did not alleviate the pain, they could offer him spinal fusion.

None of the physicians who examined appellant and whose reports were in evidence in the case, suggested that appellant could do any heavy or light work. The only physician whose report had any bearing on the subject was Dr. Treadway, appellant's family doctor, who reported the serious spinal condition heretofore detailed, referring appellant to Dr. John S. Campbell, *warning appellant against straining or lifting,* and prescribing the use of pain-killing drugs. Dr. Work's report, after his examination of appellant at the University of Michigan Hospital, that if appellant followed the instructions of the orthopedic surgeons, *it was felt* that appellant could *conceivably* return to work in approximately one month, cannot be considered as a statement that if appelllant wore a back brace and a one-half-inch heel and sole on his right foot, *he could return to work* in a month. The statement is highly suppositious and can hardly be considered as predicting a recovery from pain and disability in view of the examination of appellant three weeks later at the University of Michigan Hospital, when Dr. K. G. Campbell reported that if the cast given appellant did not alleviate the pain, the only other remedy suggested was spinal fusion. Appellant testified that he suffered great pain when he tried to change a tire, and was unable to do so. At one time, he stated he had picked up a small television set weighing about 25 pounds, and "wound up in the hospital for 9 days"; that Dr. Treadway afterward told him that he was to pick up nothing, and that if he did so, Dr. Treadway would refuse to continue treating him.

The Hearing Examiner found *that appellant had a medically determinable impairment of some severity which is expected to be of long continued and indefinite duration.* Dr. Durman, the strongest witness for appellee Secretary, concluded, after his examination of appellant, that appellant had a *rather severe* low back condition that warranted treatment including a lumbo sacral fusion.

None of the physicians who examined the appellant ever stated that he could do any type of work or that he could engage in lighter types of unskilled labor. Every physician who examined him appears to have been convinced that he continuously suffered pain as a result of the back injury. In fact, the Hearing Examiner, in addition to finding that appellant had a medically determinable impairment of some severity "which is expected to be of long-continued and indefinite duration," also explicitly found

that "All the evidence of record, both medical and lay, makes it amply clear that *claimant's primary impairment consists of residuals of his back condition and that the primary result of this condition is pain.*" (Emphasis supplied.)

But the Hearing Examiner goes on to say that "While the claimant insisted that his back pain was hardly bearable, he obviously had been able to keep it under control through the use of medication and sleeping pills." The evidence discloses that the medicines prescribed for appellant for his pain were codeine, a powerful drug, as well as another pain-killing drug, and sleeping pills which afforded him about three hours of sleep a night. However, there was no suggestion by the Hearing Examiner that appellant could keep his pain under control with drugs, except when he was doing no work.

In order, then, to relieve appellant's condition that caused the pain and to enable him to work, appellee's own witness, Dr. Durman, as well as other disinterested physicians, stated that, failing a remedy for the pain by use of a chair-brace or cast (which proved ineffectual), a spinal fusion was indicated and recommended. It is undisputed that appellant was in pain, and the Hearing Examiner, after finding that "Claimant's primary impairment consists of residuals of his back condition, and the primary result of this condition is pain," went on to hold that such pain has not been so severe as to warrant a finding that he was thereby precluded from engaging in substantial gainful activity. There was no evidence or inferences that might reasonably be drawn therefrom, that appellant's pain had not been so severe or so persistent as to find that he was thereby precluded from engaging in substantial gainful activity. No physician testified that the pain was not so severe or persistent as to warrant such finding. Dr. Treadway prescribed pain-killing drugs for the spinal injuries and warned against straining or lifting. Dr. Moore found appellant totally disabled as a re-

sult of his painful spinal condition, and Dr. John S. Campbell, Dr. Durman, and Dr. K. G. Campbell prescribed spinal fusion for his pain and disability, when certain other remedies had been tried, and when they failed—which they did.

How then does the Hearing Examiner, without evidence, arrive at a conclusion that the pain suffered by appellant had not been so severe or so persistent as to warrant a finding that he was thereby precluded from engaging in substantial gainful activity? In his opinion, the Hearing Examiner discloses why he found that appellant's pain did not disable him from substantial gainful employment, by basing his conclusion upon, and by quoting from the case of Theberge v. United States, 87 F.2d 697 (C.A. 2), as follows:

"A man may have to endure discomfort or pain * * *: much of the best work of life goes on under such disabilities * * *. The only work available to the insured must do more than hurt, it must substantially aggravate his malady."

However, the foregoing is the wrong standard, and is the basis of one of the principal errors of which the Hearing Examiner was guilty. This court has expressly held that we do not follow Theberge v. United States, supra, in disability cases under the Social Security Act; that we consider it contrary to the proper rule; that instead, we follow the view expressed in the notable opinion in Butler v. Flemming, 288 F.2d 591, 595 (C.A.5), in which Judge Brown, speaking for the court, said:

"If, as suggested in the Government's brief, Hallard v. Fleming, D.C.W.D.Ark.1958, 167 F.Supp. 205, and Judge Learned Hand's statements in Theberge v. United States, 2 Cir., 1937, 87 F.2d 697, 698, concerning a different statute enacted for a different policy in a different era, are to stand for the proposition that pain, no matter how severe, is not disabling unless work does 'more

than hurt' so that it 'substantially aggravate[s] his malady,' 87 F.2d at page 698, we regard them as contrary to the standard announced in Booker and Kerner and many others like them. Perhaps it is true that history teaches that 'A man may have to endure discomfort or pain and not to be totally disabled; much of the best work of life goes on under such disabilities * * *.' But the purpose of much social security legislation is to ameliorate some of these rigors that life imposes. Congress has in effect stated that if a person is unable except under great pain to engage in any substantial gainful activity in which he might be employable, taking into consideration his age, training, work experience and physical and mental capacities, he shall be deemed to be disabled for the purposes of this Act."

See Massey v. Celebrezze, 345 F.2d 146 (C.A. 6); Ratliff v. Celebrezze, 338 F.2d 978 (C.A. 6).

It is obvious then that the Hearing Examiner has used a standard contrary to that adopted by this court, and has held that a person is not disabled if he can engage in substantial gainful activity, even though at the cost of great pain to himself. Our holding, as above mentioned, is that an applicant is disabled if he is unable, except under great pain, to engage in any such activity.

Is there any doubt that appellant suffers disabling pain? In confirmation of what may be said to be the conclusions of all the physicians who saw him, appellant testified that it hurt him to stand, to. sit, and when he lies down. He was able to sleep between midnight and 3 A. M. After that the pain was hell. He gets up between four and five o'clock in the morning. He paid $7.50 to $10.00 a week for pain-killing drugs and sleeping pills. He was receiving disability insurance from the Metropolitan Insurance Company, arising out of the action of the union of which he was a member, and

he pays for the pills out of this money. He received surplus food "from the welfare" for himself and his three children. He testified that if there was any work available that he could do, he would be the first one to take it, but he knew of nothing he could do, in his condition. He said that he had applied for disability benefits because Dr. Treadway told him he couldn't work and ought to get such payments. Appellant's father, eighty years old, with whom he was living with his three children, testified appellant could not bend over, and "if anything drops on the floor, he can't pick it up. * * * we got to go and pick it up and lay it on the table. * * * He couldn't pick up a lug wrench, let alone a tire." He couldn't jack up a car. His mother, seventy-eight years old, with whom he was living testified: "He has so much pain, that tears run down his face. It sure is sad to see." He is of no assistance to her at home. "He can't even stoop down. And, in fact, when he has that pain it comes from the head down to his toes. He just can't take it. And, well, you feel sorry for him. And there's nothing I can do to help. I do all the washing and ironing and do everything for the children and him and for Pa and I. * * * He's lost everything he's had. So, we try to help him, but we're old." As appellant testified: "I've lost my house. I lost my car over this." The accident prevented him from keeping up the mortgage payments on his home, and the mortgage was foreclosed.

It is common knowledge these last years since the late President Kennedy went through his harrowing ordeal of a spinal fusion operation, that spinal fusion is most painful, and such an operation is often dangerous to a person's life. Several of the doctors who examined appellant, including appellee's witnesses, thought the only remedy to relieve appellant's pain and disability was spinal fusion; but they recommended against such surgery unless "it is absolutely necessary." Appellant tes-

tified: "I never had a headache in my life, but the last two years, brother, I got some dandies. I have 20/20 vision, except when I get them headaches. * * I tried hot baths, hot water bottles, hot pads. I've had all kind of physical therapy. Dr. Campbell in Ann Arbor thinks maybe that they can do something without surgery, because I told him * * * 'you can do anything you want. I'll take it as long as I can.' That's how come he's got me in a cast." On the hearing he also testified:

"Hearing Examiner: I noticed that you have a cast on.

A. It's a plaster of Paris.

Q. Is there any particular name for it?

A. Not that I know of. * * *

Q. Where does it begin? At the bottom?

A. Just about at the hips. Right here (indicates).

Q. Oh, it's below the hips really?

A. Yeah.

Q. And it comes up to—almost up to your armpits?

A. Yeah.

Q. All the way around, sir?

A. Yeah.

Q. When was that put on?

A. Two weeks ago Friday.

Q. Did you have a similar one on before?

A. No.

Q. Did you have a cast before that?

A. No. I had a brace but I couldn't wear the darn thing.

Q. How long had you had that— the brace? How long did you have the brace?

A. I had that—well, let's see, 1960 in November—[a year and a half before the hearing] and I couldn't wear it. Couldn't stand it. Anything that touches the bottom part of my back, it drives me nuts. * * *

Q. Does that brace go down over the coccyx?

A. No.

Q. Are you able to sit?

A. Not comfortable. No.

Q. You have to lean forward? Is that right?

A. Well, you sit this way this long and you sit that way so long.

Q. You sit from side to side, move from side to side, so as to be as comfortable as possible?

A. Yeah. * * *

Q. * * * Now, earlier, before we started the hearing, you made some comment regarding any operation on your back and your refusal.

A. That's right. I refused having surgery on my back, unless the pain is so severe that I cannot stand it, or that I lose the use of my legs, because I know too many people that have had back surgery and they're in worse shape than I am. At least I can get around. * * *

Q. You didn't undergo any operation for any purpose?

A. No. Not on my back. Its like I said: You can take an arm and leg, half my stomach, or * * one lung. I can live; I can get around. But if I was ever strapped to a wheelchair or in a bed or if I was a burden to somebody, I'd be nuts."

Pain was brushed aside by the Hearing Examiner in this case, when he observed appellant had been able to keep his pain under control by repeated dosages of codeine and sleeping drugs, and that in order to be considered disabled, appellant's pain must do more than hurt; it must substantially aggravate his malady.

In Drafts v. Celebrezze, 240 F.Supp. 535, 538 (E.D.S.C.), the court said:

"Pain was brushed aside as a subjective non-entity. Well reasoned opinions and the obvious pur-

poses of the Act compel that great consideration be accorded to that merciless entity called 'pain'. The fact that some extraordinary individuals can bear it and perform unflinchingly does not mean that such heroics is the 'standard'. The criterion is not even the standard of the ordinary man or the average man; the standard is the individual claimant himself, with all his personal assets and liabilities."

In addition to his erroneous views and conclusions on the disabling entity of pain, the Hearing Examiner proceeded to rule repeatedly contrary to the decisions in disability cases rendered by this court and other leading adjudications by federal courts on this subject. He held that the medical evidence did not indicate that appellant's impairment had become so severe that he was unable to engage in substantial gainful activity of a non-strenuous nature, and that there was no reason why his physical impairment would prevent him from engaging in lighter types of unskilled labor. This conclusion is entirely unjustified by the evidence. When appellant testified before the Hearing Examiner, he was wearing a plaster cast all around his body up to his armpits and below his hips. It is curious to speculate on the Hearing Examiner's conclusion that appellant was not disabled for substantial gainful employment after judging appellant's condition while his body was completely encased in a plaster cast. It is, however, emphasized in the government's brief, and it must be stated in justice to the Hearing Examiner, that, in his opinion, appellant looked rested and nourished; that he had a good color; and that his eyes were clear. Nevertheless, it is to be said that, aside from the physician who stated appellant was totally disabled, and another physician who warned appellant against straining or picking up anything from the floor, three physicians recommended a spinal-fusion operation to relieve him of his pain and disability.

These reports and recommendation, in themselves, were storm signals and evidence that appellant could not engage in substantial gainful activity; and appellant's own testimony and that of his father and mother substantiated, in a convincing and natural way, the conclusion of all of the doctors in the case. No one who had ever seen appellant stated or testified that he could do any kind of work, heavy or light. There was no evidence to support this finding of the Hearing Examiner, which was the basis of the ultimate decision in the case that appellant was not disabled from engaging in substantial gainful activity. In fact, all of the evidence was to the contrary.

While there is no evidence of what "light work" appellant could do, and nothing to substantiate the finding that he was not precluded from substantial gainful employment, this lack of evidence is supplied in a rather unorthodox way by counsel for the government in their brief, by their pointing out, without any supporting evidence, that appellant could operate a machine on an assembly line, operate a drill press or lathe, work as an industrial sweeper, or as a checker in a grocery or as a sorter or checker in a laundry, perform the work of a parking-lot attendant, a route-delivery man for a retail department store, a tool-crib or stockroom attendant, a service-station attendant, a custodian in a public school, a waiter and a dishwasher. Where government counsel secured their information about these jobs and the ability to perform them, does not appear from anything disclosed in the record. It would appear as though counsel had picked out these jobs from the U. S. Dictionary of Occupational Titles, or that their conclusions were reached speculatively by looking through listings in a telephone directory, as did a witness in Cyrus v. Celebrezze, 341 F.2d 192 (C.A. 4). Yet, even in that case there was testimony by a witness of such jobs, although it was completely discounted by the court. Here, there is no witness from

whose testimony such a list of jobs could form the basis of counsels' claim of what appellant could do. Government counsels' mere statement of what appellant could do can not be accepted.

In addition, the Hearing Examiner found that opinions of the doctors relative to the question of claimant's disability were to be disregarded because "that question is not to be resolved by opinion evidence," and that the doctors should not have been asked or allowed to state their conclusions. This holding is contrary to our decision in Hall v. Celebrezze, 314 F.2d 686, 690, in which Chief Judge Weick, speaking for the court, quoted from various authorities to the effect that while the percentage of disability can not be fixed with mathematical accuracy, opinions of medical experts based on examinations made by them are competent; that it was proper for a physician to testify that the patient was disabled from doing any kind of work, and that the disability was total and permanent. In his opinion, Judge Weick declared:

> "In our opinion, it was competent for medical experts to testify as to the nature and extent of Hall's ailments, whether temporary or permanent, their treatment and prognosis. They could testify as to what effect these ailments had on his health and his ability to perform manual labor including the degree of his disability."

There is no question that appellant is disabled from performing the work of a molder in a foundry which was his employment before his injury. The Hearing Examiner, in his opinion, admitted this, and the Disability Determination of the Department of Health, Education and Welfare reported that appellant, because of his spinal condition, was precluded from heavy work, including lifting and bending.

 The Hearing Examiner, nevertheless, concluded that there was no reason why appellant's impairment would prevent him from engaging in lighter types of unskilled labor, and referred to the U. S. Dictionary of Occupational Titles, which, he remarked, listed hundreds of unskilled light or sedentary jobs. We have already had to do with the U. S. Dictionary of Occupational Titles. See Massey v. Celebrezze, 345 F.2d 146 (C.A. 6), and Cyrus v. Celebrezze, 341 F.2d 192 (C.A. 4). However, although claiming that appellant can no longer perform the heavy work at which he was formerly employed, the Hearing Examiner, while remarking that there were many jobs in light employment available to appellant, did not specify what those light jobs were. "From all that has been said, it is obvious that, in proving that an applicant is not precluded from performing substantial gainful employment, it is not enough to rely upon testimony that a claimant can do 'light work.' What that light work consists of must be specified." Massey v. Celebrezze, 345 F.2d 157 (C.A. 6).

> "Under the Social Security Act, unlike some other statutes, it is not the burden of the claimant to introduce evidence which negatives every imaginable job open to men with his impairment, and of his age, experience and education. It is quite enough if he offers evidence of what he has done, of his inability to do that kind of work any longer, and, of his lack of particular experience for any other type of job. If there are other kinds of work which are available and for which the claimant is suited, it is the defendant's burden to adduce some evidence from which a finding can be made that he can do some type of work; actually, not apparently. * * * Here, the Referee has made no such finding, whatsoever, based on evidence." Ellerman v. Flemming, 188 F.Supp. 521, 527.

> "[The Claimant] was not required by the use of a catalogue of the nation's industrial occupations to go down the list and verbally negative his capacity for each of them or their

availability to him as an actual opportunity for employment." Butler v. Flemming, 288 F.2d 591, 595 (C.A. 5).

"[The] [t]est of a claimant's disability or inability to engage in any substantial gainful activity is a subjective one and claimant need not establish complete absence of any opportunity for substantial gainful employment and he need only establish that he has become disabled from employment in any work in which he could profitably seek employment in light of his physical and mental capacities and his education, training and experience and he need not be totally helpless or bedridden." Randall v. Flemming, 192 F.Supp. 111, 112.

There is no claim that appellant's spinal condition is remediable because of the recommendation of the medical witnesses of a spinal-fusion operation. See Jarvis v. Ribicoff, 312 F.2d 707 (C.A. 6), and Ratliff v. Celebrezze, 338 F.2d 978 (C.A. 6).

 Appellee Secretary has completely failed to show that the finding that appellant could engage in substantial gainful activity in light employment is supported by any evidence; and the burden is upon him to do so. There is no evidence of what light jobs are available to appellant, and, whether, conceding that claimant could engage in such light jobs, that they were available in the general area in which he lived. See Butler v. Flemming, 288 F.2d 591 (C.A. 5). There was no substantial evidence or specific findings regarding what appellant could do—actually, not apparently—or what employment opportunities there were available to a person who could do only what appellant could do.

In Williams v. Celebrezze, 228 F.Supp. 627, 630 (D.C.Ky.), the court said:

"The testimony of the above physicians seems amply sufficient to show plaintiff's inability to carry on any longer the work in which he was engaged for most of his adult life. Under such circumstances and conditions, contrary to the views expressed by the Hearing Examiner but according to the authorities hereinafter set out, the law places the burden upon the defendant to show that plaintiff was able to perform some kind of substantial gainful activity which was available to him; and, upon the failure of the defendant to produce evidence upon which appropriate findings in that respect could be made, plaintiff is entitled to prevail on his proofs. Rice v. Celebrezze, 6 Cir., 315 F.2d 7, 17.

"The Hearing Examiner made no findings on the issues as to what the plaintiff can do or what employment opportunities are available to a person afflicted as he was, and no evidence to sustain such findings was presented by the defendant. The rule is now thoroughly established by the Court of Appeals of this circuit that without such findings the decision of the Secretary cannot be supported. King v. Flemming, 6 Cir., 289 F.2d 808; Roberson v. Ribicoff, 6 Cir., 299 F.2d 761; Holbrook v. Ribicoff, 6 Cir., 305 F.2d 933; Jarvis v. Ribicoff, supra [312 F.2d 707 (C.A. 6)]; Hall v. Celebrezze, 6 Cir., 314 F.2d 686; Jones v. Celebrezze, 6 Cir., 321 F.2d 192."

See Ratliff v. Celebrezze, 338 F.2d 978.

In conclusion, it is our opinion that appellant at the time of filing his claim for benefits was disabled from the work he had theretofore performed and, further, that as a result of his disability, he was precluded from performing any substantial gainful employment—and evidence to the contrary is lacking in substance. Moreover, there was no proof that any job reasonably available, which appellant was capable of performing, existed within the general area in which he lived.

In accordance with the foregoing, the judgment of the district court is vacated with the direction that appellant be found to be entitled to the payment of disability benefits in accordance with his application.